PETER J. VOGEL *et al.*, Plaintiffs-Appellees, *v.* JIM G. DAWDY *et al.*, Defendants (Norman Suttles *et al.*, Defendants-Appellants).

Fourth District   No. 4—83—0510

Opinion filed April 4, 1984.

Steven N. Mottaz, of Thomas, Mottaz, Eastman & Sherwood, of Alton, for appellants.

Edwin R. Parkinson, of Jacksonville, for appellees.

JUSTICE TRAPP delivered the opinion of the court:

The plaintiffs, Peter and Gerda Vogel, commenced an action in forcible entry and detainer on June 11, 1980, seeking possession of an 811-acre tract that they had sold to Jim and Caroline Dawdy on contract. Subsequent amendments to the complaint named as defendants Norwood and Barbara Ashley and Norman and Lula Mae Suttles, who were subsequent purchasers of parcels subdivided by the Dawdys. The Dawdys and the Ashleys defaulted, and summary judgment was entered against them on April 25, 1983. They are not parties to the present appeal. The case against the Suttleses proceeded to a bench trial. On June 28, 1983, the circuit court entered judgment in favor of the Vogels and against the Suttleses. The Suttleses appeal.

The basic facts are not disputed. On March 14, 1979, the Dawdys signed a real estate escrow installment contract to purchase 811 acres of farmland in Greene County from the Vogels. Two days later, on March 16, 1979, the Dawdys entered into a contract for deed to sell 426 acres of the same land to the Suttleses. On May 9, 1979, the Dawdys entered into a similar contract with the Ashleys concerning the remaining 385 acres of the parcel. When the Vogels discovered the subsequent transactions, they brought suit for possession of the land against the Dawdys, the Suttleses, and the Ashleys.

The original complaint was filed on June 11, 1980, and was twice amended to correct the names of the defendants. The second amended complaint, filed October 1, 1980, alleged that the Vogels were entitled to immediate possession of the land, because of several breaches of the Vogel-Dawdy contract. A second count, directed against the Ashleys and the Suttleses, realleged the breaches of the Vogel-Dawdy contract and asserted that any rights of the subsequent purchasers were derivative of the rights of the Dawdys. Four distinct breaches of the Vogel-Dawdy contract were alleged: (1) that the Dawdys assigned their interest in the Vogel-Dawdy agreement without consent of the Vogels, in violation of the terms of the agreement; (2) that the Dawdys removed or suffered the removal of valuable timber from the land, in violation of the terms of the agreement; (3) that the Dawdys failed to provide the insurance required by the agreement; and (4) that the Dawdys failed to pay the 1979 taxes or to evidence payment of same as required by the agreement. The complaint asserted that each of the alleged breaches constituted default warranting forfeiture under the terms of the agreement.

At the trial, only Peter Vogel and Norman Suttles testified. Vogel testified that he and his wife owned the 811 acres in issue, and that they entered into an installment contract with the Dawdys for the

sale of the entire parcel on March 14, 1979. He stated emphatically that they had entered no contract with the Suttleses. Moreover, the Dawdys have been given no permission to resell or subdivide the 811-acre parcel. Vogel explained that the 811 acres was an "economic unit," in that the crop land constituting the majority of the acreage was necessary to support the feed lot located on the property.

Vogel testified he learned that persons other than the Dawdys were living on the land in November or December 1979, when a rumor to that effect was communicated by one of Mrs. Vogel's cousins. The Vogels were residing in California at the time. Vogel stated that he called Dawdy immediately and Dawdy assured him that there had been no sale. After that, Vogel sent his farm manager to investigate. The report he received indicated that the Dawdys were not in possession of the land and that the mailbox carried the name "Suttles." Vogel called Dawdy again and was told that the land was being leased; the Dawdys referred him to their attorney.

In January 1980, Vogel called the Dawdys and their attorney perhaps as many as 20 times to determine the status of the land. During the first week of February 1980, he returned to Illinois to investigate. After repeated attempts failed to find anyone at home when he visited the land, Vogel visited the Dawdys' lawyer. He advised the lawyer that he knew the land had been sold and demanded to see the contracts. The lawyer allowed Vogel a brief view of the contracts but did not permit him to copy the documents. Vogel testified that this was his first knowledge of the subdivision of the land and sales to the Ashleys and Suttleses.

On February 27, 1980, Vogel sent a letter to the Dawdys and their lawyer informing them of his determination that the contract had been breached. The letter stated that legal action would be initiated if the breaches were not cured within 30 days. In particular, the letter noted the sale of the property and the failure to insure the premises as actionable breaches. Vogel testified that he never received evidence from Dawdy or anyone else that the insurance and taxes were being paid on the property. He stated that he did not know the Suttleses had any claim or interest in the land when he wrote to the Dawdys; however, the Suttleses later contacted Vogel after payments were due on the Vogel-Dawdy contract. Vogel received payments from the Dawdys in 1980 and 1981, but no payments were ever received directly from the Suttleses.

Norman Suttles testified that he entered a contract for deed to buy 426 acres from the Dawdys on March 16, 1979. The contract expressly recognized the Vogel-Dawdy contract and authorized the Sut-

tleses to verify the Dawdys' payments on the Vogel-Dawdy contract through direct communication with Vogel. Suttles testified that his first contact with Vogel occurred when he telephoned Vogel to confirm that the Dawdys had made their first payment under the Vogel-Dawdy contract. He stated that he told Vogel of his arrangement with the Dawdys. Suttles did this after each payment came due under the Vogel-Dawdy contract. Meanwhile, Suttles himself was making regular payments to the Dawdys pursuant to the contract for deed on the 426 acres.

Although he knew that the Dawdys were buying the land on contract from the Vogels, Suttles testified that he did not check with Vogel to determine whether it was permissible to buy the land, because he relied on his real estate agent to do so. Suttles stated that he read his contract with the Dawdys, but he did not read the Vogel-Dawdy contract. Specifically, he denied any knowledge of the nonassignability clause in the Vogel-Dawdy contract.

Suttles testified that he originally attempted to protect his interests by writing the checks jointly to Dawdy and Vogel, but Dawdy rejected this mode of payment, and Suttles never made a payment directly to Vogel. He testified that he paid the taxes on the land throughout his possession and also kept the place insured. Suttles acknowledged that some trees had been cut down on the property, but he said that the logging had been done before he took possession.

On June 27, 1983, the circuit court entered judgment against the Suttleses and in favor of the Vogels. The court found that the Vogel-Dawdy contract had been breached in several particulars. Further, since the Suttleses knew of the Vogels' interest prior to signing the Dawdy-Suttles contract, the court found that the Suttleses were not good-faith purchasers and the rights were merely derivative of any rights held by the Dawdys. Accordingly, the court held that the Vogels were the legal owners of the land and entitled to possession free and clear of any claim or interest of the defendants.

On appeal, the Suttleses argue that the trial court erred in entering judgment for the Vogels, because (1) the Vogels waived their rights under the nonassignment clause of the Vogel-Dawdy contract; (2) the statutory action in forcible entry and detainer cannot be maintained absent proper notice and demand; (3) an order granting possession is not binding upon one not joined as a defendant; and (4) the right to the crops on the land has not been resolved.

The nonassignment clause in the Vogel-Dawdy contract provided as follows:

"BUYERS AGREE:

* * *

(4) not to sell, assign, grant, set over or convey the premises herein conveyed nor to assign their interest, nor any part thereof, in this contract without the prior written consent of the Sellers, which will not be unreasonably withheld."

The Suttleses argue that the Vogels waived their rights under this clause by accepting payments from the Dawdys after learning of the purported sale to the Suttleses.

The record before this court reveals only two payments made from the Dawdys to the Vogels. The first was made on or about February 15, 1980. According to the uncontradicted testimony of Mr. Vogel, this predated the Vogels' awareness of the Dawdy-Suttles transaction. The second, due February 15, 1981, occurred after the filing of the initial complaint. The Vogels' knowledge of the Dawdy-Suttles transaction at the time of the second payment is not disputed; the filing date of the original complaint is, of course, a matter of record.

■ In support of their waiver argument, the Suttleses cite the general rule that a contract vendor may waive his right to strict compliance with contract provisions if his contract is inconsistent with an intention to strictly enforce the contract terms. This principle is often cited in "late payment" cases, and is based on the theory that a vendor may not lull a vendee into loose compliance with contract terms and later claim such imperfect compliance as breach of the contract. (See *Miles Homes, Inc. v. Mintjal* (1974), 17 Ill. App. 3d 642, 307 N.E.2d 724.) The Suttleses have not cited any authority, however, to support the application of this principle under the circumstances presented in this case. As noted earlier, the Vogels received only one payment after becoming aware of the purported sale to the Suttleses. That payment was made in February 1981, many months after the complaint was filed. We find it plain that no act committed by the vendor after the filing of the complaint would lull the vendee into imperfect compliance with the contract terms. The waiver rule cited by the Suttleses has no application on these facts.

Moreover, even if it could be found that the Vogels waived the nonassignment clause, there is other sufficient proof of breach to sustain the judgment. One violation alleged in the complaint concerned the defendants' failure to insure the property according to the terms of the Vogel-Dawdy contract. On appeal, the Suttleses virtually ignore this branch of the case. The Vogel-Dawdy contract specified what type of insurance was to be maintained for the property and also required that proof of proper coverage be supplied to the Vogels. Although Norman Suttles testified that the property was insured in some man-

ner, the imprecision in his testimony precludes a certain determination that the coverage satisfied the requirements of the contract. It was undisputed, however, that the Vogels never received proof of the required coverage.

Under the terms of the Vogel-Dawdy contract, nonperformance of the insurance requirement was defined as a default. The trial court specifically found that the failure to comply with the insurance clause constituted a breach of the Vogel-Dawdy contract. In consequence, the judgment could be sustained on the allegation and proof of the violation of the insurance clause, even if the Vogels had waived their rights under the nonassignment clause.

In their second argument on appeal, the Suttleses argue that the forcible entry and detainer action may not be maintained, because they were not served with the notice and demand required under the statute. (Ill. Rev. Stat. 1981, ch. 110, par. 9—102.) The Vogels do not contend that statutory demand and notice were delivered. Since certain subsections of the statute require written demand and others do not, however, it is necessary to determine the precise statutory basis for this action. Section 9—102 sets forth several distinct factual settings under which an action in forcible entry and detainer may be commenced. The Suttleses maintain that the action could be brought against them only pursuant to subsection 9—102(5) of the statute. Subsection 9—102(5) states that an action in forcible entry and detainer may be brought:

> "When a vendee having obtained possession under a written or verbal agreement to purchase lands or tenements, and having failed to comply with the agreement, withholds possession thereeof, after demand in writing by the person entitled to such possession." (Ill. Rev. Stat. 1981, ch. 110, par. 9—102(5).)

This subsection describes one of the three situations in which a written demand is expressly required prior to the commencement of an action under the statute. Section 9—104 states an additional notice requirement for actions brought under subsection 9—102(5). The requirement of written demand is a strict condition precedent for an action of this variety. *Eddy v. Kerr* (1981), 96 Ill. App. 3d 680, 422 N.E.2d 176; see *French v. Willer* (1888), 126 Ill. 611, 18 N.E. 811.

■ We disagree that the action against the Suttleses could be brought pursuant to subsection 9—102(5). As to the Vogels, who are the persons "entitled to the possession of the lands" (first sentence of section 9—102), the Suttleses clearly are not "a vendee" described in subsection 9—102(5). We are persuaded that the action was properly brought under subsection 9—102(2), however, which applies "[w]hen a

peaceable entry is made and possession unlawfully withheld." (Ill. Rev. Stat. 1981, ch. 110, par. 9—102(2).) This provision more closely describes the method by which the Suttleses came to possession. The Suttleses appear to be more the peaceful trespassers anticipated by subsection 9—102(2) than the good-faith purchasers anticipated by subsection 9—102(5). Moreover, subsection 9—102(5) appears to require privity, whereas subsection 9—102(2) does not.

Prior notice and demand for possession are not required in an action brought under subsection 9—102(2). (*Sullivan v. Culp* (1931), 260 Ill. App. 443.) Plainly, no such requirement appears in the provision itself. In reference to the other subsections of the statute that do not mention demands, the courts have uniformly concluded that no demand is necessary when the statute does not expressly require it. (See *Stillman v. Palis* (1890), 134 Ill. 532, 25 N.E. 786 (subsection 9—102(1)); *Travis v. Geiger* (1919), 215 Ill. App. 461 (subsection 9—102(4)).) The authority cited by the Suttleses to the contrary is unpersuasive, for it is pure *dicta*. *West Side Trust & Savings Bank v. Lopoten* (1934), 358 Ill. 631, 193 N.E. 462, did not address the question examined here; further, the language relied upon by the Suttleses is itself based on *dicta* from prior decisions. We hold that the action against the Suttleses was properly brought under subsection 9—102(2) and consequently no demand or notice was required.

■ The Suttleses' third issue on appeal suggests that the judgment is not binding upon the Suttleses' son Steven, because he was never joined as a defendant. We find this contention utterly devoid of merit. First, although Steven Suttles plainly was not joined as a defendant, there also is nothing in the record to suggest that he has any relation to the controversy. The record on appeal bears no mention of this name. Second, Steven Suttles has not made any effort to become a party to this appeal. If he were aggrieved by the judgment, it would be he, rather than his parents, who would have standing to vindicate those rights. Third, the only order referred to in the Suttleses' argument on this point is the writ of restitution, which is not an order preserved for appeal by the notice of appeal. As such, this court lacks jurisdiction to consider the question. 87 Ill. 2d R. 301.

Finally, the Suttleses request this court to determine rights relating to the 1983 crops grown on the land. Prior to hearing oral argument on the merits of this case, this court remanded the cause to the trial court for the purpose of appointing a receiver to preserve the crops, to oversee the harvest, and to invest the proceeds therefrom. This procedure served to facilitate the order of protection previously entered in the trial court. The question of the right to the crops was

never raised prior to this appeal, however. This is conceded by the parties to this appeal. Insofar as there is no ruling on the question, there is nothing to review in this regard.

We find no error in the judgment of the trial court. The cause is remanded to the trial court for the purpose of winding up the receivership in a manner consistent with the views expressed herein.

Affirmed; remanded in part with directions.

MILLER and WEBBER, JJ., concur.